**In re Michael LAZZARA, Debtor.**

**Benjamin Cutler, by his agent Sheilah Cutler, Plaintiff,**

v.

**Michael Lazzara, Defendant.**

**Bankruptcy No. 99 B 02000.
Adversary No. 99 A 00582.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 18, 2002.

Paul J. Skryd, North Riverside, IL, for debtor.

Jay A. Steinberg, Foley & Lardner, Chicago, IL, for trustee.

### Memorandum Opinion and Order

ROBERT E. GINSBERG, Bankruptcy Judge.

This matter is before the Court on the First Amended Petition [sic] for Nondischargeability of Plaintiff Benjamin Cutler ("Benjamin"). A trial was held on May 11 and 22, 2000. For the reasons stated in this opinion, this Court finds that the debts owed to Benjamin by Defendant Michael Lazzara (the "Debtor") are dischargeable.

### Jurisdiction

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as a proceeding arising under § 523(a)(6) of the Bankruptcy Code, 11 U.S.C. § 523(a)(6).

### Facts

Benjamin owns real property located at 3130 S. Laramie Avenue, Cicero, Illinois. The building on the property contains a tavern, and two apartments at the rear of the tavern. Both Benjamin and his daughter, Sheilah Cutler, alternatively "Sheilah" and "Benjamin," or collectively "the Cutlers," are active in the operation of the tavern and in the management of the apartment building. May 11, 2000 Transcript of Proceedings before the Honorable Robert E. Ginsberg ("Tr. I") at 16–17.

The Debtor moved into one of the apartments in late 1995 or early 1996. Tr. I at 5, 18, 35. There was no written lease with respect to the apartment that the Debtor occupied. According to the Cutlers, Benjamin charged the Debtor rent of $550.00 per month. Tr. I at 5, 17.

Initially, the Debtor and his son were the only occupants of the apartment rented by the Debtor. Sometime later, Veronica Robles ("Robles"), the Debtor's fiancee, moved into the apartment along with her two daughters. The Debtor was the father of one of the children, and the other

child was Robles' daughter from another relationship. Two dogs, one a Chihuahua, and the other a Golden Retriever, also lived in the apartment with the Debtor.

The Debtor moved out of the apartment in June 1998, after the Circuit Court of Cook County, Illinois (the "State Court") entered an order of eviction in a forcible detainer action Sheilah had filed several months earlier. Tr. I at 7, 38, 48, 78. At the time of the eviction, the Debtor was living in the apartment with Robles, his and Robles' daughters, and the Golden Retriever. Tr. I at 18, 37–38. In addition to entering the order of eviction, the State Court entered a judgment in the amount of $3,885.00 for unpaid rent against the Debtor. Answer to First Amended Petition for Nondischargeability ("Ans."), ¶ 9.[1]

Benjamin testified at trial that after the Debtor vacated the premises, he entered the apartment and found it "absolutely in shambles." Tr. I at 10. According to Benjamin, the rugs were ripped and reeked of urine and feces from the dogs. Tr. I at 12. The door was "like punched in," Tr. I at 10, and there were crayon marks on the wall. When the rug was removed, tiles came off the bedroom floor. Tr. I at 10. The flooring had to be replaced because it was wet and warped. Tr. I at 12. Benjamin testified that he paid over $5,000 for repairs to the apartment. Tr. at 11.

Acting on Benjamin's behalf, Sheilah brought an action in the State Court for property damage to the apartment. Tr. I at 11. Ultimately, a judgment was entered in favor of Benjamin and against the

Debtor in the amount of $4,982.74 property damage. Ans., ¶ 9. At the trial in this case, Sheilah testified that the second State Court judgment was entered by default. Tr. I at 30. While the Debtor testified that he had appeared in the second State Court proceeding, his testimony was unclear whether he confused that proceeding with the earlier forcible detainer action. Tr. I at 43–47. Robles stated that she had testified in the State Court "same like I am now." Tr. I at 78.

In this adversary proceeding, Benjamin seeks a determination that the judgments he holds against the Debtor for unpaid rent and property damage are nondischargeable under 11 U.S.C. § 523(a)(6), as debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." As a basis for relief, Benjamin contends that the Debtor stopped paying rent after Benjamin reminded him that under the terms of the parties' oral lease, only the Debtor and his son could live in the apartment. Tr. I at 5, 24. Pets were not allowed per se. Tr. I at 7. It is Benjamin's view that after the Cutlers obtained an order of eviction against the Debtor from the State Court, the Debtor retaliated by willfully and maliciously damaging the apartment. Plaintiff's Memorandum in Support of a Finding of Nondischargeability at 5.

The Debtor denies that the parties had an oral agreement on the terms that Benjamin alleges. Tr. I at 36. At trial, the Debtor testified that Benjamin said nothing about pets and additional tenants. Ac-

---

**1.** At trial, the parties did not introduce into evidence copies of the judgments or other parts of the record from the eviction proceeding or from the action for property damage that the Cutlers subsequently brought in the State Court. Benjamin testified in this Court that he sought back rent of "about $3,500 or something like that," in the forcible detainer

action, Tr. I at 8, and that he received an award of $5,000 in the action to recover property damages. Tr. I at 11–12. In determining the amounts of the debts at issue here, the Court has looked to the Debtor's answer in this adversary proceeding, where he admits Benjamin's allegations as to the amounts of the two judgments against him.

cording to the Debtor, Robles moved into the apartment only a few months after he did. The Debtor maintains that Benjamin knew that Robles was living there, but did not object. Tr. I at 36, 51–53. The Debtor acknowledged that he had refused to pay rent for the last five to six months that he lived in the apartment. He justified his failure to make rent payments on grounds that Benjamin failed to make necessary repairs. Tr. I at 39, 51.

According to the Debtor, the apartment was "a wreck" when he moved into it. Tr. I at 39. Problems requiring attention included the blood stains from the spoiled meat in the refrigerator and on the kitchen floor; the filthy carpeting; and a hole in the living room picture window. In addition, electrical fixtures lacked covers, there was a hole in a bedroom door, and termite damage to window frames was at such a level as to cause glass to fall out. Tr. I at 48–49. On the plus side, the Debtor testified that he cleaned the apartment so that the premises were at least minimally habitable. Tr. I at 43, 49–50.

The Debtor acknowledged that some repairs were made. For example, the Cutlers caused the rotting kitchen floor to be replaced. The Debtor nevertheless testified that the repair was incomplete, since he could see light through a gap between the baseboard and the floor when anyone turned on the lights in the basement below his apartment. Tr. I at 50. The Debtor denied that he intentionally damaged any part of the apartment, but he did admit that his youngest daughter may well have written on the walls with crayons. Tr. I at 49–50. The Debtor stated that he did not believe that he told the Cutlers about the termite damage he found in the building. Tr. at 49.

When asked about the condition of the premises at the time he left the apartment, the Debtor testified that the premises were clean, and that there was "nothing wrong," except for the hole in the window that had been there from the outset, and the "nasty carpet" in one or more rooms. Tr. I at 42–43.

At trial, each of the parties presented two additional witnesses in support of each party's conflicting version of the facts surrounding this dispute. Benjamin called Sheilah Cutler and John Edward Pierce as witnesses. Robles and Daniel Carabine testified on the Debtor's behalf.

Sheilah testified that when the Debtor moved into the apartment, there were some items in need of repair. A new carpet had recently been installed, but replacement of the kitchen floor, subfloor and joists was not completed until approximately a month or two later. Additionally, all the rooms were painted shortly after the Debtor moved into the apartment. According to Sheilah, after the initial repairs, everything was intact, and nothing was damaged. Tr. I at 17, 21–22, 31–33.

Sheilah further testified that the Debtor moved out of the apartment in June or July 1998. Tr. I at 18, 25. After the Debtor moved out, Sheilah entered the apartment and found a great deal of damage. There were holes in one or more doors, the front door was broken, some doorknobs had been removed, the toilet was stopped up, there were crayon marks and large pictures drawn on the walls, and the carpet was shredded. Sheila testified that there was feces on the rug, and that when she pulled the rug up, tiles stuck to the rug. Urine was visible in the spaces between the tiles underneath the rug. Tr. I at 26, 31.

Sheilah said the Debtor gave her several reasons why he stopped paying rent. First, the Debtor told the Cutlers that he would not pay rent because "we were throwing him out anyway," and second

because he had complaints about "some damages." Tr. I at 20. Later in her testimony, Sheilah stated that the Cutlers told the Debtor and Robles to leave the apartment as soon as they found out that Robles was living there with the Debtor. Tr. I at 33.

Sheilah was asked about the results of a inspection completed by the Village after the Debtor left the apartment. Sheilah testified that the Village inspectors found the premises filthy and directed her to have it cleaned and painted. Tr. I at 27. Sheilah initially denied that there was some termite damage, but then acknowledged that some "minor" damage was found. Tr. I at 27–29.

John Edward Pierce ("Pierce"), a general contractor, essentially corroborated Benjamin's and Sheilah's testimony. Pierce testified that in the winter of 1996–1997, he made extensive repairs to the apartment occupied by the Debtor. At that time, the major concern was the repair of the floor between the bathroom and kitchen of the apartment. Plumbing and electrical work was done, floors in the bathroom and kitchen were replaced, and the entire apartment was painted. May 22, 2000 Transcript of Proceedings before the Honorable Robert E. Ginsberg ("Tr. II") at 6–8. Pierce had known the Debtor for some time, and the two enjoyed a "very cordial" relationship. Tr. II at 9. Pierce responded affirmatively when asked if the Debtor had expressed satisfaction with his work. Tr. II at 9.

Pierce testified that he returned to the apartment about a year and a half later, around July 4, 1998. The apartment was not occupied. When questioned regarding the condition of the premises at the time of his second visit, Pierce stated that the apartment looked "trashed, as if somebody had left animals in it for a long period of time." Tr. II at 10. The apartment smelled of animal excrement. There were holes in the walls and a door, and there was writing on the walls. In Pierce's opinion, the rug was beyond repair, and the kitchen floor covering had separated from the subfloor, as if there had been water damage. The kitchen floor was dirty, and the bathroom floor looked like it needed to be redone. Tr. II at 11–13.

Robles testified that she moved into the apartment after the Debtor had been living there for about two months. Robles described frequent encounters she and the Debtor had with the Cutlers either in the tavern or in the yard of the building. The encounters appear to have been generally pleasant. As a result of these encounters, Robles testified that in the year or year and a half that she lived there, the Cutlers were well aware that she and her children were living in the apartment. In addition, according to Robles, she and the Debtor frequented the Cutlers' bar. Sometimes she would even cook Mexican food, and bring it to Benjamin in the bar. Tr. I at 62–63.

Robles conceded that neither she nor the Debtor "directly" sought permission for her and/or her children to move into the apartment. The same is true with respect to the dogs. Tr. I at 69–72. When questioned concerning the condition of the apartment, Robles confirmed many of the same problems described by the Debtor, e.g., a hole in the picture window, a defective repair to the kitchen floor, and living room carpet in poor condition. Tr. I at 71–72, 75. Among additional problems, Robles testified that there were numerous leaks in the apartment, electrical wiring was frayed and exposed, the front door would not lock, and there was a rodent problem. Tr. I at 72, 79–82, 88. In fact, the condition of the carpet in the living room was so poor that out of concern for her daughter's allergy problems, Robles

would not allow her daughter to sit on the living room rug. Tr. I at 67. Robles testified that the Cutlers did not respond to their repeated requests to make necessary repairs, Tr. I at 64–66, and that she ultimately "called code violations." Tr. I at 84. In Robles' words, "the court order [*i.e.*, the eviction order] was put into effect because I had called code violations because Mr. Cutler and Sheila Cutler were not taking care of the building." Tr. I at 84.

According to Robles, during the time she lived there, she painted and made some minor repairs to the apartment. She did not want to make additional repairs because "we weren't getting any cooperation," and "I don't own the building." Tr. at 73–74. Robles testified that before leaving, she cleaned the apartment and shampooed the carpets. Tr. 75, 79. Robles stated that she regularly took the dogs out. She denied that the dogs had ever to her knowledge relieved themselves in the apartment. Tr. I at 88.

The Debtor's final witness was Daniel Carabine ("Carabine"), a general contractor who was living in the apartment previously occupied by the Debtor and Robles. Carabine had moved into the apartment some time about May 1999. Tr. I at 91.

Carabine testified that he paid $500 per month in rent to Benjamin as part of "his arrangement . . . not our arrangements." Tr. I at 95.[2] "My deal with Ben—Mr. Cutler—was that—he said whatever you want to do to the apartment do. And I was going one room at a time fixing it all because I'm going to live there." Tr. I at 99.

Among the repairs that Carabine said he made in the year preceding trial, Carabine had replaced the "punched out" doors, as well as wood trim and floor boards that were infested by termites. Tr. I at 93. For some reason unknown to Carabine, the ceilings were missing from the front room and bedroom and had to be replaced. Tr. I at 94. In addition, Carabine replaced a broken front room window and a front entrance door that would not lock. Tr. I at 96–97. Carabine did not know if other repairs had been made in the time interval between the Debtor's departure in June 1998 and the time Carabine moved into the apartment around May 1999. Tr. I at 96–97.

Among the Debtor's exhibits attached to his proposed pretrial order, there was admitted into evidence a copy of a Town of Cicero property code violation report dated June 30, 1998. The notice directed Sheila to make repairs to "your property," including scraping and painting the first floor apartment, and repairing a picture window. Debtor's Pretrial Memorandum ("D. Pretrial Mem."), Ex. B. A building permit dated July 21, 1998 describes several necessary repairs to be made to the Cutlers' building, including the replacement of termite-damaged wood and drywall where needed. D. Pretrial Mem., Ex. A.

There was no testimony at trial by any witnesses who had seen the Debtor's apartment during the period between the time Pierce worked on the apartment in the winter of 1996–1997, and the time the Debtor was evicted in June 1998. The Cutlers both testified that during the entire time the Debtor was supposed to be living in the apartment, they never got an answer when they knocked on the door to his apartment, Tr. I at 8, 19, nor did they see any evidence of the Debtor's occupan-

---

**2.** Carabine was not asked to explain this somewhat cryptic comment concerning his understanding with Benjamin.

cy. In any case, there is no evidence in the record that vandals or anybody else broke into the apartment at any time between the Debtor's departure from the property in June 1998 and Pierce's visit to the property in July 1998.

## Discussion

This Court has had the opportunity to consider the briefs of the parties, as well as the demeanor, tone and attitude of the witnesses for both sides. The Court concludes that in this proceeding each of the witnesses was for the most part trying to tell the truth as he or she saw it. That is not to say that any witness actually told the whole truth. For example, while Robles testified about a serious rodent problem, Tr. I at 79–81, and dangerous electrical problems in the kitchen and bathroom, Tr. I at 64–65, those problems were not even mentioned in the Debtor's testimony. Sheilah testified that marks on the walls resembled "gang graffiti," Tr. I at 26, but Pierce's testimony makes only a passing reference to writing on the walls. Tr. II at 11. Overall, each side's witnesses appeared to exaggerate to some extent.

The witnesses' testimony was essentially consistent as to the basic facts. The focal point was the condition of the apartment and/or the building at various points in time. The testimony of the witnesses was almost uniform in describing an apartment that at best was marginally habitable during and after the debtor lived there with his wife and family. The place reeked of canine waste. Portions of the walls, ceilings and floors were seriously damaged. Repairs and maintenance were sporadic at best.

It is clear under Illinois law that a landlord impliedly warrants that a rented dwelling is habitable and fit for living. *Glasoe v. Trinkle,* 107 Ill.2d 1, 13, 479 N.E.2d 915, 919, 88 Ill.Dec. 895, 899 (1985). The implied warranty of habitability "re-

quires that at the inception of the lease there be no latent defects in those facilities vital to the use of the dwelling for residential purposes and vital to the life, health, and safety of the tenant and that the premises will remain habitable throughout the term of the lease." *Id.,* 107 Ill.2d at 13, 479 N.E.2d at 920, 88 Ill.Dec. at 900. On the other hand, a landlord owes no duty to a tenant to repair defects unless there is an express agreement to that effect, or where there are latent defects of which the landlord has knowledge or is chargeable with knowledge, in which case the landlord has a duty to disclose them. *Jones v. Chicago Housing Authority,* 59 Ill.App.3d 138, 140, 376 N.E.2d 26, 28, 17 Ill.Dec. 133, 135 (1st Dist.1978). When a tenant vacates a rented dwelling, the tenant is required to leave the premises in the same condition as they were when the tenant first took possession, normal wear and tear excepted. *Ikari v. Mason Properties,* 314 Ill.App.3d 222, 228, 731 N.E.2d 975, 980, 247 Ill.Dec. 202, 207 (2d Dist. 2000); *Pyramid Enterprises, Inc. v. Amadeo,* 10 Ill.App.3d 575, 579, 294 N.E.2d 713, 716 (1st Dist.1973).

The Debtor and Robles testified that despite repeated requests to the Cutlers to make necessary repairs, Benjamin never hired the contractors required to do the repairs needed in the building. However, despite his and Robles' numerous complaints, the Debtor testified that the premises were at least livable at the outset, and, therefore, he may not have advised the Cutlers of the full extent of the poor condition of the apartment. Pierce also testified that he worked on the apartment while it was occupied only by the Debtor and his son, and that when he completed his work, the apartment was in good shape. The Debtor's and Sheilah's testimony indicates that the apartment was, in

fact, habitable when the Debtor took up residence there in late 1995 or early 1996.

Much of the testimony at trial focused on the condition of the apartment when the Debtor left it in June 1998. The Cutlers and Pierce both described shredded carpets, animal feces and urine on the floors, as well as crayon marks on the walls. The Debtor himself admitted that crayon marks on the walls might have been made by his daughter, who would have been about six years old in 1998.[3] From Robles' testimony, it can be inferred that she and the Debtor could control the dogs, but failed to do so. The Court discredits the Debtor's and Robles' testimony that they left the apartment in a clean condition. All of the testimony about the condition of the building at the time the Debtor and Robles left it was to the contrary. Tr. I at 10–12, 26, 31; Tr. II at 10–13.

The Court gives extra weight to the testimony of Pierce and Carabine. Both were generally unbiased witnesses. Their testimony concerned the differences in the condition of the building at various points in time. Both were knowledgeable, competent and forthcoming in their testimony.

Although Carabine did not report having seen all the problems noted by Pierce, almost a year passed before Carabine entered onto the property. Since the Town of Cicero had in the interim inspected the premises and directed that filthy conditions be cleaned up, Tr. I at 27, Carabine's testimony does not rebut the evidence concerning the condition of the apartment and parts of the building within the Debtor's control. Based on Pierce's testimony, the Court finds that the Debtor failed to maintain the apartment properly and instead allowed it to fall into deplorable condition before he vacated it.

For a debt to be found nondischargeable under § 523(a)(6), the creditor must establish by a preponderance of the evidence that the debtor's actions in incurring the debt were willful and malicious and that those actions led to injuries to the creditor's person or property. *Kawaauhau v. Geiger*, 523 U.S. 57, 60–61, 118 S.Ct. 974, 976, 140 L.Ed.2d 90 (1998). Thus, there are three elements that must be proved: (1) that the debtor's actions caused an injury to the creditor's person or property; (2) that the debtor's actions were willful; and (3) that the debtor's actions were malicious. *E.g., Glucona America, Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 356 (Bankr.N.D.Ill. 2001); *Kingvision Pay Per View, Ltd. v. DeMarco (In re DeMarco)*, 250 B.R. 681, 685 (Bankr.N.D.Ill.2000). The creditor seeking a finding of nondischargeability must establish each of those three elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991); *Kolodziej v. Reines (In re Reines)*, 142 F.3d 970, 973 (7th Cir.1998), *cert. denied*, 525 U.S. 1068, 119 S.Ct. 797, 142 L.Ed.2d 659 (1999).

Generally, debts for breach of contract are not excepted from discharge under § 523(a)(6). *Tari v. Huggins (In re Huggins)*, 252 B.R. 567, 569 (Bankr. M.D.Fla.2000). This is true even in the case of an intentional breach of contract. *In re Jercich*, 238 F.3d 1202, 1205 (9th Cir.), *cert. denied sub nom. Jercich v. Petralia*, 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001). Such a debt will be dischargeable, unless the breach was accompanied by conduct resulting in willful and malicious injury. *Id.*

In this adversary proceeding, Benjamin seeks a finding of nondischarge-

---

**3.** In May 2000, the daughter was eight years old. Tr. I at 49.

ability with respect to the two debts reduced to judgment by the State Court. The first judgment, entered in the forcible detainer action, awards damages for nonpayment of rent. Tr. I at 8. Since that debt arises from breach of the parties' alleged oral lease agreement, it does not fall within the exception under 11 U.S.C. § 523(a)(6).[4] *E.g., Jercich,* 238 F.3d at 1205.

On the other hand, Benjamin's second judgment awards compensation for property damage, a cause of action sounding in tort. The record clearly supports the conclusion that the Debtor permitted the damage to occur while he was in control of the apartment. The Court therefore concludes that Benjamin has established by a preponderance of the evidence that the Debtor caused an injury to Benjamin.

 Looking to the other two elements under § 523(a)(6), Benjamin must establish that the injury was both willful and malicious. Since a person will rarely, if ever, admit to acting in a willful and malicious manner, those requirements must be inferred from the circumstances surrounding the injury at issue. *O'Brien v. Sintobin (In re Sintobin),* 253 B.R. 826, 831 (Bankr.N.D.Ohio 2000). In order to promote the notion of a fresh start in bankruptcy, the provisions of the Bankruptcy Code providing exceptions to the dischargeability of debts are construed strictly against a creditor and liberally in favor of a debtor. *In re Morris,* 223 F.3d 548, 552 (7th Cir.2000).

 In *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) the United States Supreme Court explained the standards to be used in determining whether the conduct in a particular proceeding is "willful" as required by 11

U.S.C. § 523(a)(6). As the Court explained, the word "willful" modifies the word "injury." *Geiger,* 523 U.S. at 61, 118 S.Ct. 974. Thus, it is not enough that there is a deliberate or intentional act that leads to injury. *Id.* Nondischargeability requires that the injury itself be deliberate or intentional. *Id.* In other words, the debtor must intend the consequences of the action taken, not merely performance of the action itself. *Id.*

 A number of decisions have found that a debtor's failure to maintain rental property or collateral, without more, is not enough to support a claim of nondischargeability under 11 U.S.C. § 523(a)(6). *Sparks v. King (In re King),* 258 B.R. 786, 796–97 (Bankr.D.Mont.2001) (debtor's/tenant's failure to keep a rented duplex in repair was the result of negligence, rather than an intention to injure the creditor/landlord); *Wurm v. Ridgway (In re Ridgway),* 265 B.R. 853, 857–58 (Bankr. N.D.Ohio 2001) (debtor/purchaser under a land installment contract committed waste to the building subject to contract; under Ohio law willful and malicious conduct was not an essential element of a cause of action for waste); *Wells v. Jennings (In re Jennings),* 188 B.R. 110, 114 (Bankr. E.D.N.Y.1995) (even though the dangerous and unsafe condition of the debtor's property might have caused the fire that damaged a neighbor's property, the debtor was merely negligent in the care and maintenance of her property); *Mathes v. Woolner (In re Woolner),* 109 B.R. 250, 255 (Bankr.E.D.Mich.1990) (mortgagee's loss caused by the debtor's improper maintenance of his farm prior to foreclosure was not a debt arising from willful and malicious conduct; rather, the debtor's conduct was negligent); *Ross v. DeVier (In re*

---

**4.** Benjamin has not argued that the debt for unpaid rent is nondischargeable under any

other subsection of 11 U.S.C. § 523(a) or any other provision of the Bankruptcy Code.

*DeVier),* 57 B.R. 602, 606 (Bankr. E.D.Mich.1986) (a state court judgment for damages to a rented home could have been based on negligence, rather than intentional and malicious injury). In each of these cases, the determining factor was the court's conclusion that the debtor's conduct was negligent, rather than intentional. Debts based on negligence are dischargeable. Debts based on willful and malicious conduct are not. *Geiger,* 523 U.S. at 64, 118 S.Ct. at 978; *Rae v. Scarpello (In re Scarpello),* 272 B.R. 691, 704 (Bankr. N.D.Ill.2002).

That is not to say that there is no caselaw that supports Benjamin's position. In *O'Brien v. Sintobin (In re Sintobin),* 253 B.R. 826, 831 (Bankr.N.D.Ohio 2000), a state court had entered judgment against two debtors who had allowed their children and their children's friends to spray paint walls, knock doors off their hinges, and commit other acts of waste in a rented home. The *Sintobin* bankruptcy court found that on repeated occasions, the debtors' children and the children's friends "flagrantly caused serious damage" to the home. *Id.* In the landlord's nondischargeability action, the principal question presented was whether the debt for property damage should be nondischargeable under 11 U.S.C. § 523(a)(6) when the debtors themselves had not committed acts of vandalism against the property.

*Sintobin* acknowledged that a number of decisions have found that parents are not vicariously liable under 11 U.S.C. § 523(a)(6) for willful and malicious acts of their children. *See, e.g., Deroche v. Miller (In re Miller),* 196 B.R. 334, 336–37 (Bankr.E.D.La.1996). However, the *Sintobin* court went on to observe that there is no requirement in § 523(a)(6) that a debtor actually be an entity that physically occasions damage to a creditor or to a creditor's property. *Id.* at 830. According

to *Sintobin,* it was consistent with generally accepted principles of tort law to find that any person who encourages another person to commit a willful or malicious act to the injury of another entity should not be entitled to have the liability arising from that wrongful action discharged in bankruptcy. *Id.* at 830. *Sintobin* stated that there was "a policy goal of § 523(a)(6) which is to except from a bankruptcy discharge those debts incurred by morally reprehensible conduct." *Id.* at 831 (citing *Murray v. Wilcox (In re Wilcox),* 229 B.R. 411, 418 n. 7 (Bankr.N.D.Ohio 1998)). " 'Analysis of the historical background of § 523(a)(6) demonstrates that where there is conduct of an exceptionally culpable nature, participated in or permitted by a responsible person, the liability resulting therefrom may not be dischargeable.' " *Id.* (quoting *Bowse v. Cornell (In re Cornell),* 42 B.R. 860, 864 (Bankr.E.D.Wash. 1984)).

In concluding that the debtors before it possessed the requisite intent to injure, the *Sintobin* court noted there was no evidence that the debtors attempted to discipline their children, or otherwise teach them to behave properly. *Id.* at 829. The debtors never made any attempt to prevent the children and their friends from damaging the house, and they did not try to repair the damage themselves or to tell the landlord about the damage. *Id.* In their testimony, the debtors showed no remorse for causing or promoting the damage. *Id.* at 831. In fact, they acted as if they did not care about the condition of the property and the injury it sustained. *Id.*

The *Sintobin* court also observed that much of the damage occurred during a period when the relationship between the debtors and their landlord was deteriorating. *Id.* Drawing inferences from the evidence, the *Sintobin* court found "that the

Defendants' complete apathy over what occurred to the Plaintiff's house both influenced and encouraged their children and their friends to commit acts of vandalism against the house, and that the end result was intended by the Defendants." *Id.* Thus, the *Sintobin* debtors, by their intentional failure to control or discipline their children and friends of the children, were deemed to have willfully and maliciously injured their landlord's property. *Id.*

*Sintobin* and the instant case have a number of similarities. Both involve injury to residential rental property, and much of the damage complained of was caused by animals or children, as well as the result of inaction by the debtor. As in *Sintobin*, the Debtor denies that he took any overt action to damage the apartment.

On the other hand, the type of damage complained of in this adversary proceeding is of a kind that can develop over time, as a consequence of deplorable housekeeping. No witnesses testified concerning conditions within the apartment in the time period between the completion of Pierce's work, and the time the Cutlers entered it in June 1998. Unlike *Sintobin*, there is no evidence that persons with destructive tendencies either lived in or visited the apartment. Some of the damage would have occurred in the period when the Debtor's relationship with the Cutlers was deteriorating, but there is no evidence that such damage did not already exist before the Cutlers brought the forcible detainer action. Finally, in their testimony, the Debtor and Robles did not display the kind of complete indifference about the condition of the apartment that troubled the court in *Sintobin.*

Overall, the circumstantial evidence is insufficient to support an inference that a desire to injure the Cutlers motivated the Debtor to allow the apartment to fall into such a deplorable condition. Allowing the apartment to fall into disrepair may be considered an intentional act, but the testimony at trial did not establish the intent to inflict injury on a creditor or a creditor's property that is part of the definition of willfulness under *Geiger.*

Because the Court has determined that the Debtor's conduct was not "willful," it need not reach the question whether the conduct was also "malicious" within the meaning of § 523(a)(6). *ABF, Inc. v. Russell (In re Russell),* 262 B.R. 449, 455 (Bankr.N.D.Ind.2001); *Manna v. Havranek (In re Havranek),* No. 97 B 30745, 2000 WL 277171 (Bankr.N.D.Ill. March 13, 2000).[5] Although the Debtor caused injury to Benjamin's property, it has not been established that the Debtor intended to injure Benjamin or his property, as required for an injury to be "willful" under 11 U.S.C. § 523(a)(6).

### Conclusion

For the foregoing reasons, this Court finds that the debts owed by the Debtor, Michael Lazzara, to the Plaintiff, Benjamin Cutler, are dischargeable.

---

**5.** Nor does the Court need to determine whether "willful and malicious" conduct is a "unitary concept," as a number of courts have found. *See Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598, 606 (5th Cir. 1998), *cert. denied,* 526 U.S. 1016, 119 S.Ct. 1250, 143 L.Ed.2d 347 (1999) *See also Baldwin v. Kilpatrick (In re Baldwin),* 245 B.R. 131 (9th Cir. BAP 2000), *aff'd,* 249 F.3d 912 (9th Cir.2001). The reasoning underlying that conclusion is that where an injury is intentional, as it must be under the *Geiger* decision, the injury necessarily cannot be justified or excused. *See Miller,* 156 F.3d at 606.