In re Jennifer Ruth **PETERSON**, a/k/a Jennifer Ruth Gershman, Debtor.

**Norm Gershman's Things to Wear, Inc., and Norman Gershman, Plaintiffs,**

v.

**Jennifer Ruth Peterson, a/k/a Jennifer Ruth Gershman, Defendant.**

**Bankruptcy No. 04–12495(PJW). Adversary No. 04–56027.**

United States Bankruptcy Court, D. Delaware.

Nov. 15, 2005.

cases.

---

**8.** It is noted that there was no mention of preemption by Plaintiff in either of the earlier

Christopher J. Curtin, Erisman & Curtin, Wilmington, DE, for Plaintiffs.

Joseph B. Green, Green, Green, Godowsky & McFadden, Wilmington, DE, for Debtor/Defendant.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

Plaintiffs Norman Gershman and Norm Gershman's Things to Wear, Inc. filed a motion for summary judgment (Adv.Doc. # 7) with respect to their adversary complaint which requests a determination that the debt owed to them by the debtor Jennifer Ruth Peterson is nondischargeable. For the reasons set forth below, the plaintiffs' motion for summary judgment will be denied.

## BACKGROUND

On August 31, 2004, Jennifer Ruth Peterson filed a voluntary petition under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code").[1] Ms. Peterson's schedules list her assets as having a value of $17,450.00 and lists her liabilities at $72,739.94. Among such liabilities, Ms. Peterson owes the plaintiffs $10,845.51 on a prepetition judgment that the plaintiffs obtained in the Delaware Court of Common Pleas.[2]

For some time prior to May 1997, Ms. Peterson and David Gershman lived together in a New Castle apartment. In May of 1997, however, Ms. Peterson and David Gershman were invited to move into

---

1. Individual sections of the Bankruptcy Code will be cited herein as " § ____ ".

2. The background facts are primarily drawn from the Court of Common Pleas decision

dated February 26, 2004. Neither party disputes these facts for purposes of this motion. (Adv.Doc. # 1, Exh.1); (Adv.Doc. # 10, p. 1).

a house owned by plaintiff Norm Gershman's Things to Wear Inc. (hereinafter the "Business"). The house was located at 317 Country Club Drive in Rehoboth Beach, Delaware. The property was never used as a rental property; rather, it was for the use and enjoyment of the Business's shareholders, who consisted entirely of the Gershman family. Plaintiff Norman Gershman, David Gershman's father, was the majority shareholder of the Business.

When Ms. Peterson and David Gershman left their New Castle apartment, they took with them Ms. Peterson's dog Samantha. Samantha had caused damage to the New Castle apartment, which resulted in a dispute with Ms. Peterson's landlord. As a result, Norman Gershman assisted Ms. Peterson in finding a lawyer to address the matter.

Because Norman Gershman had helped Ms. Peterson find a lawyer, he was certainly aware that the dog had caused damage to the New Castle apartment. Based on this knowledge, Norman Gershman approached Ms. Peterson before she moved into the Rehoboth house. During that discussion, Ms. Peterson orally agreed that she would be responsible for any damage caused by her dogs to the Rehoboth house. Norman Gershman further informed Ms. Peterson that only one dog would be permitted to live on the property; by that time, Ms. Peterson had three dogs: Samantha, China and Sadie. To allay Norman Gershman's concerns, Ms. Peterson assured him that she would find somewhere else for China and Sadie to live. Ms. Peterson never made good on that promise.

On October 4, 1998, Ms. Peterson and David Gershman were married. During their marriage, Ms. Peterson and David Gershman continued to reside in the Rehoboth house. In February of 2001, Ms. Peterson and David Gershman separated.

Thereafter, David Gershman was in-and-out of the house sporadically until sometime in late March or early April 2001, at which time he left permanently.

After David Gershman moved out of the house, Norman Gershman visited the property. It was a mess: carpets, flooring, walls, furniture, and woodwork were scratched, broken, torn, and soiled with dog waste. As a result, Norman Gershman contacted Ms. Peterson.

On May 15, 2001, Ms. Peterson met with Norman Gershman. At that meeting, Ms. Peterson signed a written agreement between herself and Norman Gershman affirming that she had earlier orally agreed that she would be solely responsible for the damage done to the house by the dogs. Subsequent to the signing, Norman Gershman and Norm Gershman's Things to Wear, Inc. brought suit against Ms. Peterson in the Delaware Court of Common pleas.

On February 26, 2004, the Court of Common pleas rendered judgment for the plaintiffs in the amount of $10,845.51 for the damage done by the dogs. The court did not award punitive damages. Several months later, on August 31, 2004, Ms. Peterson filed her petition. The plaintiffs now seek to have this Court declare that their judgment is nondischargeable because Ms. Peterson's actions in allowing the dogs to damage the property were willful and malicious.

## DISCUSSION

*Standard of Review*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.

R. Civ. P 56(c).[3] "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted). When deciding a motion for summary judgment, the court views the facts, and all permissible inferences from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where the record could lead a reasonable trier of fact to find for the non-moving party, disposition by summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Willful and Malicious*

█ Section 523(a)(6) of the Bankruptcy Code provides:

(a) A discharge under ... this title does not discharge an individual debtor from any debt—

. . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity

"[T]he standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). This burden rests on the moving creditor. *Id.*

█ To satisfy its burden, the creditor must prove a "willful and malicious injury by the debtor." "The word 'willful' in [subsection] (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original). In other words, recklessly or negligently inflicted injuries do not rise to the level of "willful and malicious." *Id.* at 64, 118 S.Ct. 974. As such, a knowing breach of contract will not ordinarily rise to the level of "willful and malicious." *Id.* at 62, 118 S.Ct. 974; *see also In re Lazzara*, 287 B.R. 714, 722 (Bankr.N.D.Ill.2002) (stating that even debts for intentional "breach of contract are not excepted from discharge.").

Aside from concluding that a debtor must intend the injury, the Supreme Court in *Kawaauhau* did not specify the precise mental state necessary to rise to the level of "willful and malicious." *Wrobel v. Conner (In re Conner)*, 302 B.R. 509, 514 (Bankr.W.D.Pa.2003) (citing *Petralia v. Jercich, (In re Jercich)*, 238 F.3d 1202, 1207 (9th Cir.), *cert. denied*, 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001)).

As a result, appellate courts have taken both an objective and subjective approach to the inquiry. *In re Conner*, 302 B.R. at 514. It is unclear which approach the Third Circuit has adopted because the Circuit has not had the opportunity to revisit the issue post-*Kawaauhau*. *Id.* But in *Conte v. Gautam*, 33 F.3d 303 (3d Cir. 1994), decided before *Kawaauhau*, the Third Circuit arguably endorsed an objective approach. *In re Conner*, 302 B.R. at 515 n. 4.

Under the subjective approach, an injury is willful and malicious if the debtor caused harm through a deliberate action *with the belief that there was a* substantial certainty of injury. In contrast, under the

---

**3.** Federal Rule of Civil Procedure 56(c) is applicable to matters in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7056.

objective approach, an injury is willful and malicious if the debtor caused harm through a deliberate action *with an objective* substantial certainty of injury. *Id.* Under either approach, however, Ms. Peterson's conduct does not rise to the level of willful and malicious.

*Issue and Claim Preclusion*

■ The requirement of full faith and credit, stated in 28 U.S.C. § 1738, "has long been understood to encompass the doctrines of res judicata, or 'claim preclusion,' and collateral estoppel, or 'issue preclusion.'" *San Remo Hotel, L.P. v. City & County of San Francisco,* — U.S. —, —, 125 S.Ct. 2491, 2500, 162 L.Ed.2d 315 (2005) (citation omitted).[4]

> Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.

*Allen v. McCurry,* 449 U.S. 90, 96 n. 8, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

■ Claim preclusion principles do not apply to this Court's determination of nondischargeability. *See Archer v. Warner,* 538 U.S. 314, 321–22, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) (*quoting Brown v. Felsen,* 442 U.S. 127, 138, 99 S.Ct. 2205, 60

L.Ed.2d 767 (1979)) ("mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt."); *see also Moore v. Murphy (In re Murphy),* 297 B.R. 332, 347 (2003) ("claim preclusion does not bar a bankruptcy court's ... [determination of] dischargeability."); *Mattson v. Hawkins (In re Hawkins),* 231 B.R. 222, 231 (1999) ("a pre-petition state court judgment does not have a res judicata effect ... [on a determination of dischargeability].").

■ In contrast, "collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)." *Grogan v. Garner,* 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755, 24 C.B.C.2d 1 (1991). To support a claim of collateral estoppel, under Delaware law, the following four elements must be shown:

> (1) The issue previously decided is identical with the one presented in the action in question,
>
> (2) the prior action has been finally adjudicated on the merits,
>
> (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and
>
> (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Betts v. Townsends,* 765 A.2d 531, 535 (Del.2000).[5]

---

4. Res Judicata can also refer to both claim preclusion and issue preclusion generally. *See, e.g., Baker by Thomas v. GMC,* 522 U.S. 222, 233 n. 5, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998); *see also Super Van v. City of San Antonio (In re Super Van),* 92 F.3d 366, 370 n. 11 (5th Cir.1996) ("[T]he doctrine of res judicata, in its broadest sense, encompasses two distinct preclusion concepts, claim preclusion (res judicata) and issue preclusion (collateral estoppel). Unfortunately, the terminology

used in this area of the law often breeds confusion." (citations and quotations omitted)).

5. The Delaware doctrine of collateral estoppel applies because Federal Courts must give preclusive effect to state court judgments whenever courts of that state would do so. 28 U.S.C. § 1738.

As discussed below, the judgment of the Court of Common Pleas did not decide whether Ms. Peterson's conduct was willful and malicious as that term is understood under § 523(a)(6) of the Bankruptcy Code. Because an identical issue was not previously adjudicated, there is no issue preclusion (for either party) as to dischargeability.

■ The defendant argues that since the Court of Common Pleas awarded only compensatory damages-not punitive damages, that necessarily resulted in the Court of Common Pleas finding that no willful or malicious injury occurred. I do not agree.

The defendant relies only on a handful of state law decisions discussing Delaware's standard for punitive damages. The defendant concludes that the standard for punitive damages is identical to § 523(a)(6). This is not the case, however. Punitive damages in Delaware are discretionary; thus, a failure to award punitive damages means only that the trier of fact did not exercise its discretion to award such exemplary damages. *See Jardel Co., Inc. v. Hughes,* 523 A.2d 518, 528 (Del. 1987) ("an award [of punitive damages] is, in a real sense gratuitous."); *Riegel v. Aastad,* 272 A.2d 715, 718 (Del.1970) ("it was within the jury's discretion ... to award reasonable punitive damages."); *see also Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) ("a key feature of punitive damages ... [is] that they are never awarded as of right, no matter how egregious the defendant's conduct").

■ In other words, "there is no question under the general law that an award of punitive damages rests in the discretion of the finder of fact even when the factual predicate for such an award has been established." *Alston v. Chrysler Corp.,* C.A. No. 97C–09–214, 1999 Del.Super. LEXIS 146, at *2, 1999 WL 463703, at *1 (Del.Supr. May 24, 1999). "Because the decision is discretionary, the trier of fact is not required to award punitive damages, even if it finds that the defendant's acts were oppressive or malicious or the evidence otherwise warrants punitive damages." 22 AM. JUR. 2D *Damages* § 550 (2004)(collecting authorities).

This Court need not-and does not-decide whether a *grant* of punitive damages can have a preclusive effect on a § 523(a)(6) determination.[6] But because punitive damages are discretionary, a *failure* to award such damages cannot have preclusive effect under § 523(a)(6). *In re Pitner,* 696 F.2d 447, 449 (6th Cir.1982)("failure of a jury to award punitive damages does not necessarily result in the discharge of a judgment debt claimed to be nondischargeable as arising from a willful and malicious act."); *see, e.g., In re Olson,* 32 Fed.Appx. 194 (8th Cir.2002) (rejecting argument that failure to award punitive damages precludes a determination of nondischargeability); *In re Branam,* No. 98–17412, 1999 U.S.App. LEXIS 32796, at *7–8, 1999 WL 1206656, at *3 (9th Cir. Dec.15, 1999)(same); *In re Wagner,* No. 93–8099, 1994 U.S.App. LEXIS 28244, at *8–9, 1994 WL 551342, at *3 (10th Cir.Wyo. Oct. 11, 1994)(same); *In re Moffitt,* 252 B.R. 916, 923 (6th Cir. BAP 2000)(same); *In re Rowland,* Civ. No. 88–1099, 1988 U.S. Dist. LEXIS 5487, at *9–10, 1988 WL 73431, at *4 (D.N.J. June 13, 1988)(same); *In re Ertz,* 28 B.R. 1020, 1022 (D.S.D.1983)

---

6. "The standard for punitive damages is established by state law and may vary from the federal requirement for nondischargeability." *Combs v. Richardson,* 838 F.2d 112, 117 (4th Cir.1988). This Court need not decide whether, under Delaware law, an award of punitive damages necessarily requires a finding of willful and malicious injury as that term is understood under the Bankruptcy Code.

(same); *In re Brown,* 263 B.R. 832, 834 (Bankr.S.D.Ohio 2000)(same); *In re McQueen,* 102 B.R. 120, 124 (Bankr. S.D.Ohio 1989) (same); *In re Gonsor,* 95 B.R. 123, 124 (Bankr.D.S.D.1988) (same); *In re Cooney,* 8 B.R. 96, 97 (Bankr. W.D.Ky.1980)(same); *In re Bishop,* 55 B.R. 687, 689 (Bankr.W.D.Ky.1985)(same); *In re Rizo,* 34 B.R. 886, 888 (Bankr. D.Colo.1983)(same); *but see In re Thompson,* 39 B.R. 270, 273 (Bankr.W.D.Ky.1984) (determining that a failure to award punitive damages foreclosed a finding of willful and malicious injury under 523(a)(6)); *In re Davis,* 23 B.R. 633, 635 (Bankr.W.D.Ky. 1982)(same).

Therefore, under the circumstances, neither claim nor issue preclusion requires this Court to hold the debt dischargeable.

*The Plaintiff's Claim of Willful and Malicious Injury*

██ Likewise, neither claim nor issue preclusion requires this Court to hold the debt *non*dischargeable. The Court of Common Pleas awarded the plaintiffs $10,845.51 in compensatory damages but no punitive damages. This judgment was based on two independent grounds. First, Ms. Peterson's oral and written agreements that she would be solely responsible for the damage of her dogs; and, second, Section 1711 of Title 7 of the Delaware Code. Section 1711, entitled Liability of Dog Owner For Damages, mandates the following: "The owner of a dog is liable in damages for any injury, death or loss to person or property that is caused by such dog ...." DEL. CODE ANN. tit. 7, § 1711 (2005). The statute sounds in strict liability. *Bemiller v. Rodriguez,* No. 99C–12–002, 2000 Del Super. LEXIS 363, at *4, 2000 WL 1611085, at *2 (Del.Super.Aug.21, 2000).

Neither Ms. Peterson's breach of contract, nor her liability under the dog ownership statute can be said to have a preclu-sive effect on whether her conduct was willful and malicious. As noted above, a knowing breach of contract will not, without more, rise to the level of willful and malicious. The Supreme Court explicitly rejected an interpretation of willful and malicious that would encompass a knowing breach of contract:

> The Kawaauhaus' more encompassing interpretation could place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, i.e., neither desired nor in fact anticipated by the debtor. Every traffic accident stemming from an initial intentional act—for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic—could fit the description. A "knowing breach of contract" could also qualify. A construction so broad would be incompatible with the "well-known" guide that exceptions to discharge "should be confined to those plainly expressed."

*Kawaauhau v. Geiger,* 523 U.S. 57, 62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (citations omitted). Thus, not only does the Court of Common Pleas' determination of breach of contract have no preclusive effect, but such conduct clearly does not fall within the definition of willful and malicious. *Id.*

Similarly, the dog ownership statute will not help the plaintiffs in this case. That statute is based on strict liability. It does not contemplate any particular mental state and does not require a finding of a willful and malicious injury. *In re Pourdas,* 206 B.R. 516, 520 (Bankr.S.D.Ill.1997) (holding a failure to obtain a license or insurance policy for vicious dog, in violation of a strict liability statute, was not willful and malicious).

Plaintiffs contend, however, that the statute embodies the notion that "[t]he danger of dog damage is so great, that it is

generally recognized in the community, which enacted a statute announcing the public policy on the subject." (Adv.Doc. # 8, p. 25). Therefore, according to the plaintiffs, the conduct rises to the level of willful and malicious. To support this, the plaintiffs rely on a line of cases that hold that debts arising from vicious dog bites are nondischargeable.

Specifically, plaintiffs cite five cases for the proposition that vicious dog bites are nondischargeable under § 523(a)(6). All five cases were decided prior to *Kawaauhau*. Moreover, four-of-the-five were decided by state courts prior to the enactment of the Bankruptcy Code, specifically, *Peerson v. Mitchell*, 205 Okla. 530, 239 P.2d 1028 (Ok.1950), *Jaco v. Baker*, 174 Or. 191, 148 P.2d 938 (1944), *Yackel v. Nys*, 258 A.D. 318, 16 N.Y.S.2d 545 (N.Y.App. Div.1939), *Humphreys v. Heller*, 157 Misc. 568, 283 N.Y.S. 915 (N.Y.Supr.1935). Such cases have limited persuasive value. *See In re Quezada*, 718 F.2d 121, 122 n. 1 (5th Cir.1983) (rejecting *Yackel* and *Humphreys*) *cert. denied*, 467 U.S. 1217, 104 S.Ct. 2662, 81 L.Ed.2d 368 (1984); *In re Sadwin*, 3 B.R. 581, 583 (Bankr.M.D.Fla. 1980) (holding dog bite debt dischargeable and noting that contrary precedent was decided by state courts under old law) *aff'd by* 15 B.R. 884 (M.D.Fla.1981).

Further, the fifth case, *In re Rines*, 18 B.R. 666 (Bankr.M.D.Ga.1982), rested its determination on the belief that the 1978 Bankruptcy Code amendment did not intend to overrule the reckless-disregard standard articulated in *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904). After *Kawaauhau*, the reasoning articulated in *Rines* is no longer tenable. *See Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

Even before *Kawaauhau*, however, many courts rejected the reasoning in *Rines* and determined that a vicious dog bite was dischargeable. *See, e.g., In re Quezada*, 718 F.2d at 123 (collecting authorities and rejecting the reasoning and conclusions of *Rines* due to *Rines'* erroneous belief that the 1978 amendment was not intended to overrule the reckless-disregard standard); *In re Gargac*, 88 B.R. 129, 130 (Bankr. N.D.Ohio 1988)(rejecting *Rines*); *In re Cecko*, 27 B.R. 26, 27 (Bankr.N.D.Ohio 1982) (declining to follow *Rines* under "strikingly similar" fact pattern).

Therefore, plaintiffs' claim that such "dog bite" cases support a ruling that the injury was willful and malicious must be rejected. All of the cases cited were decided under old law and most have been expressly disapproved. The more recent authorities hold that dog bites will not generally constitute willful and malicious injuries.

Moreover, this is not even a dog bite case. This case involves the keeping of dogs with a propensity towards messiness-not viciousness. Thus, plaintiffs reliance on dog bite authorities is misplaced. It is one thing to knowingly keep a vicious dog, it is another to knowingly keep a messy dog.

Rather than conceptualizing the present case as a dog bite case, it is more useful to think of the issue as akin to a landlord tenant dispute.[7] For example, in *Sparks v. King, (In re King)*, 258 B.R. 786 (Bankr. D.Mont.2001), the court found that damage done to the residence by the tenants was negligently inflicted rather than done in a willful and malicious manner. Although the sources of damage were in dispute, the court held that even if the debtor had

---

7. It is clear, however, that the parties are not a landlord and tenant. (Adv.Doc. # 1, Exh. 1, p. 11)

caused damage in the form of punching holes in the walls and allowing his children to damage the front door, the actions would not amount to a willful and malicious injury. *Id.* at 796. Likewise, in *Lilledahl v. Kibbee (in re Kibbee)*, 287 B.R. 239 (Bankr.E.D.Mo.2002), the Court stated that "the cost of repairing and cleaning up the premises is not the kind of injury contemplated by section 523(a)(6)." *Id.* at 244.

Most similar to the instant facts, however, is *Cutler v. Lazzara (In re Lazzara)*, 287 B.R. 714 (Bankr.N.D.Ill.2002). In that case, the court considered whether or not damage done to the plaintiffs' property by the debtor's dogs constituted a willful and malicious injury. *Id.* at 723. There, the plaintiffs alleged the following damages:

> The rugs were ripped and reeked of urine and feces from the dogs. The door was "like punched in," and there were crayon marks on the wall. When the rug was removed, tiles came off the bedroom floor. The flooring had to be replaced because it was wet and warped.

*Id.* at 717 (citations omitted). The defendant in that case claimed that they did not cause such damages but the court discredited the defendant's testimony and found that the defendant left the property in a "deplorable condition." *Id.* at 722. The court also found that the defendant "could control the dogs, but failed to do so." *Id.*

Nonetheless, in the court's words, "the type of damage complained of ... is of a kind that can develop over time, as a consequence of deplorable housekeeping." *Id.* at 725. And although "[s]ome of the damage would have occurred in the period when the Debtor's relationship with the ... [plaintiffs] was deteriorating, ... there is no evidence that such damage did not already exist before the ... [relationship began to decline]." *Id.* Therefore, "the circumstantial evidence is insufficient to support an inference that a desire to injure the ... [plaintiffs] motivated the Debtor to allow the apartment to fall into such a deplorable condition." *Id.*

The reasoning of *Lazzara*, set forth above, is directly applicable to the instant matter. The facts of this case and those of *Lazzara* are close in nature; the damages complained of are similar; and, both injuries arise from the same source-destructive canines.

The plaintiffs argue that "the damage was extensive and repeated over time" and that "the dog damage climaxed in the last month of Ms. Peterson's occupancy." (Adv.Doc. # 8, pp. 8, 13) The fact that the damage was extensive and repeated does not, on its own, require a finding that the defendant acted willfully and maliciously. Rather, the plaintiffs must also show that this damage resulted from the defendant's intentional act that had a substantial certainty to cause injury. The plaintiffs implicitly suggest that the nature of the damage (being repeated and extensive) alone is sufficient to show the requisite substantial certainty. This is not the case, here. As stated, "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau*, 523 U.S. at 61, 118 S.Ct. 974 (emphasis in original). The conduct in this case may be negligent or even reckless but it is not willful and malicious. *See In re Lazzara*, 287 B.R. at 722 (holding debt dischargeable where the "[defendant] could control the dogs, but failed to do so."). As a matter of commonsense, it would seem against the defendant's interest to damage her own living space.

Once the defendant knew she needed to move, however, this commonsense disincentive-to not damage the home-would be removed. Accordingly, the plaintiffs al-

lege that the "climax of the damage in the last mo[n]th" proves that the defendant's conduct was willful and malicious. (Adv. Doc. # 8, p. 26).

The Court has difficulty accepting the plaintiffs' assertion. It is far from clear that the damage climaxed in the final month. In the Court of Common Pleas, David Gershman testified extensively regarding the long term abuse of the house, his participation in it and his father's knowledge of it. For example, David Gershman gave the following testimony:

Q. You're aware that dogs had caused problems at the last place you lived with Jen, is that correct?

A. Yes.

Q. Would you tell the Court about that, please?

A. We lived in a townhouse together. The dogs actually destroyed the house pretty much. There were, Saman...

Q. Where, where was there damage that was done by the dogs?

A. On the carpets. The carpets were soiled, and there were the puppies of Samantha that were living in the house. One in the bedroom, and then into the garage they moved, and the odor in the house was just horrible, absolutely horrible.

Q. And was your father made aware that there were problems with Samantha and her puppies causing damage at that house?

A. Yes, he was aware of it.

\* \* \* \* \* \*

Q. Do you know whether he saw the dog damage to the extent it's exhibited in the pictures in the exhibit before you, while you and Jen were living in the house?

A. I think he saw some of the damage. He was a little aware of it. He wasn't completely aware of it, because we covered a lot of it up.

\* \* \* \* \* \*

Q. Mr. Gershman, was the carpet stained with, by the dogs at the time it was, of the taking of the picture here that's in twelve?

A. Yes.

Q. It was stained?

A. It was stained.

Q. Was it, did the staining increase over time?

A. Yes.

Q. And tell us about why that the staining of the carpeting would increase over time.

A. The dogs just went to the bathroom whenever they felt like going to the bathroom.

Q. Was it, were you making any effort to keep the, the house clean?

A. We made efforts, but it just, there were three dogs, and they would go to the bathroom at any time that they wanted to. It was, again, mainly, I mean, mainly at night. When we woke up in the morning, it was just like walking through a minefield. You know, literally, we were trying to move in and out of stains.

Q. Both defecation and urine?

A. Both, yes.

Q. Did the problem worsen the longer you stayed in the house?

A. It was just an ongoing problem. It just kept going on and on, so it got worse and worse. I mean, if you...

\* \* \* \* \* \*

Q. And did you take care of the, the dogs during the, the time you did live in the house?

A. A little bit.

Q. Now, tell us about your work schedule, her work schedule, and scheduling taking care of the dogs.

A. She worked a lot, I worked a lot. I had a break during my—I worked mornings and nights, and I came home for a couple of hours during the day. In the afternoon I would take a nap. I worked the split shift, six nights a week, six days a week, and with her schedule, I mean, she was working in Ocean City at one point for, she was gone for twelve, thirteen, fourteen hours a day, so, I mean, it left me no choice but to do the chores around the house and take care of the dogs.

Q. Now, and, and what care would you take of the dogs?

A. Walk them.

Q. For what purpose?

A. So, they wouldn't go in the house.

* * * * * *

Q. Did there come a time when your father talked with either you or Jen about the fact that there were still the puppies in the house?

A. Yes.

Q. How often, how did it come up and how often did it come up?

A. I thought you guys, he asked, I thought you were going to get rid of the dogs, you know. He knew that Paul offered to take the dogs, or dog, and she just wouldn't let go. She didn't want to separate them.

Q. Were you willing?

A. Absolutely.

Q. Did your father ever ask you to get rid of the dogs?

A. No.

(Adv.Doc. # 9, Tr. pp. 246–47, 250, 255–56, 258–59, 262).

This testimony makes several points rather clear, namely, (1) the damage caused by the dogs occurred over a four-year period, and it is not possible to say that the final month was worse than many other times in the four year period, (2) both Ms. Peterson and David Gershman were responsible for the damage over that four-year period, (3) Norman Gershman was aware that contrary to Ms. Peterson's prior commitment, she continued for years to have three damage causing dogs in the house, (4) Norman Gershman was aware that damage was being done to the house by reason of the dogs' presence, and (5) Ms. Peterson and David Gershman, acting jointly, hid from Norman Gershman the full extent of the damage.

David Gershman's role in allowing the deplorable conditions to occur does not excuse the defendant from her oral and written agreements. Similarly, it does not shield her from the strict liability imposed under the Delaware statute. Nonetheless, David Gershman's role in the matter, the identity of his interest with that of his father's and his father's acquiescence is relevant to the issue of whether Ms. Peterson's conduct was willful and malicious in so far as these facts can be viewed as plaintiffs allowing the injury to occur. This result is inconsistent with willful and malicious debtor conduct.

This Court, after viewing the photographic evidence, is not unsympathetic to the plaintiffs' situation. But § 523(a)(6) does not contemplate the injuries the plaintiffs suffered. *In re Kibbee,* 287 B.R. at 244. Although the defendant's dogs caused injury to the property, the plaintiffs have not shown that the defendant was willful and malicious as required by § 523(a)(6).

## CONCLUSION

For the foregoing reasons, the Court will deny the plaintiffs' motion for summary judgment.

## ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the plaintiffs' motion (Adv.Doc. # 7) for summary judgment is DENIED.